UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>DEVONTE FRANCIS,<br><br>Defendant. | **ORDER**<br><br>25 Cr. 103 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Devonte Francis is charged in Count One of the Indictment with possessing ammunition on September 18, 2024, in violation of 18 U.S.C. § 922(g)(1), and in Count Two with possessing a loaded Ruger LCP .380 pistol on October 10, 2024, also in violation of 18 U.S.C. § 922(g)(1). (See Indictment (Dkt. No. 24) ¶¶ 1-2)

Francis has moved to (1) dismiss either Count One or Count Two as multiplicitous; and (2) suppress evidence recovered on October 10, 2024, pursuant to a search warrant. (See Def. Mot. (Dkt. No. 38)) In connection with his motion to suppress, Francis seeks a Franks hearing. (See Def. Br. (Dkt. No. 39) at 4, 10)

For the reasons stated below, Francis's motions will be denied.

## BACKGROUND

### I. THE SEARCH WARRANT

On October 4, 2024, Magistrate Judge Sarah Netburn signed a sealed Complaint charging Francis – a prior felon – with possessing ammunition in connection with a shooting in the Bronx on September 18, 2024. (See Cmplt. (Dkt. No. 1) ¶¶ 3-8) Francis was arrested on the Complaint on October 10, 2024. (Dkt. No. 4)

Later that day, Magistrate Judge Robert W. Lehrburger signed a search warrant for 1105 Willis Avenue, Apartment 5D, in the Bronx. (Search Warrant, Def. Br., Ex. E (Dkt. No. 39-5)) Judge Lehrburger issued the search warrant based on an affidavit submitted by Detective Daniel Callinan of the New York City Police Department ("NYPD"). (Id. at 4) The Callinan Affidavit incorporates by reference the October 4, 2024 Complaint, also sworn to by Det. Callinan. (Id. ¶ 6)

## A.    The Complaint's Allegations

In the Complaint, Det. Callinan provides the following description of a shooting that took place in the early afternoon of September 18, 2024, in the vicinity of a bodega located on Alexander Avenue between East 134th Street and Bruckner Boulevard:

a. On or about September 18, 2024, at or about 12:42 p.m., a black male (the "Shooter") entered the bodega. The Shooter was wearing black jeans; black shoes; a black hoodie; a chain or necklace around his neck that was mostly covered by the hoodie except for portions along the left and right clavicles; and a black baseball cap emblazoned with the Chicago White Sox logo on the front and what appears to be a logo of a globe and "WORLD SERIES 05" on the left side of the cap. The Shooter wore the bill of the baseball cap turned slightly towards the right, and the tips of cornrows or braids stuck out from under the cap. The Shooter also had a goatee.

b. At or about 12:43 p.m., a black car double parked along the sidewalk opposite of the bodega. Victim-2 (wearing a red hoodie, black pants, and white shoes) stepped out of the driver's seat of the car, Victim-1 (wearing a gray hoodie, gray sweatpants, and blue and white sneakers) stepped out of the front passenger's side, and they both walked across the street towards the bodega.

c. Inside the bodega, the Shooter was at the deli counter. When Victims-1 and -2 approached and entered the front door of the bodega, the Shooter looked in the direction of Victims-1 and -2 for approximately 9 seconds. Victims-1 and -2 then walked behind the Shooter towards the back of the bodega. When they got near the back of the bodega, the Shooter again looked towards Victims-1 and -2.

d. Less than approximately 30 seconds after entering the bodega, Victims-1 and -2 walked back towards the front door. Just after Victim-1 passed behind the Shooter, Victim-1 turned around and appeared to look towards the Shooter for approximately 7-8 seconds. Victims-1 and -2 left the bodega at or about 12:44 p.m.

e. Once outside, Victims-1 and -2 waited on or near the sidewalk for approximately two-and-a-half minutes. During that time, Victim-1 repeatedly looked towards the bodega.

f. Inside the bodega, the Shooter briefly paced near the counter, then walked towards the front of the bodega and appeared to be looking through the glass door towards Victims-1 and -2. The Shooter then went to the counter to pick up his sandwich. At the counter, the Shooter reached out with his left hand to grab the black plastic bag with his sandwich and kept his right hand inside the right pocket of his hoodie. The Shooter went to the front door, pushed it open with his left hand, and continued to keep his right hand inside the right pocket of his hoodie.

g. At or about 12:46 p.m., the Shooter exited through the front door of the bodega. Victims-1 and -2 (who, as described above, had been waiting outside the bodega) immediately approached the Shooter, who tried to walk away. A witness who was inside the bodega indicated that she heard the Shooter say "step off" to Victims-1 and -2. When Victim-1 continued to follow him, the Shooter back pedaled down the sidewalk, pulled a gun out of the right pocket of his hoodie and appears to have fired a shot in the direction of Victim-1. As Victim-2 ran into the bodega, Victim-1 ran with a slight limp into the street and away from the Shooter, and headed north on Alexander Avenue. The Shooter chased Victim-1 partway down the block, appearing to aim and fire his gun again at Victim-1. Victim-1 weaved through the parked cars and a Citi bike rack, eventually escaping west on 134th Street.

h. The Shooter turned around, ran south on Alexander Avenue, over Bruckner Boulevard to 132nd Street, went east on 132nd Street, and entered a parking garage.

i. Victim-2 exited the bodega, got into his black car, and drove north on Alexander Avenue. As he crossed over 134th Street, Victim-1 appeared again on Alexander Avenue. Victim-2 double parked his car under the Interstate 87 overpass and ran back to help Victim-1.

(Cmplt. (Dkt. No. 1) ¶ 4(a)-(i))

At about 12:47 p.m., the NYPD received a 911 call reporting shots fired on Alexander Avenue, between East 134th Street and Bruckner Boulevard. The caller heard two shots, and described the shooter as a Black male wearing a hoodie, black pants, and a baseball cap and running south on Alexander Avenue towards Bruckner Boulevard. (Id. ¶3(a)) When police arrived at the scene at 12:49 p.m., they found a young man ("Victim-1") who had suffered a gunshot wound to his right thigh. Victim-1 was accompanied by another young man wearing a

3

red hoodie ("Victim-2"). Police searched the nearby area and found two .380 caliber shell casings in the vicinity of the bodega. (Id. ¶¶ 3(b)-(d))

As of September 18, 2024, Defendant Francis was serving a term of supervised release in connection with a 2023 conviction in this District for conspiracy to commit racketeering. (Id. ¶ 7(b)) Francis's U.S. Probation Officer reviewed a still photograph taken from surveillance footage showing the shooter entering the bodega. The probation officer identified Francis as the man shown entering the bodega. (Id. ¶ 5)

In the Complaint, Det. Callinan also states that he has "identified a particular Instagram account . . . that appears to be used by FRANCIS." A photograph of Francis is the profile picture for this Instagram account, and the account contains many photos and videos of Francis. (Id. ¶ 6) (emphasis in original) About ten days after the September 18, 2024 shooting, this account "posted an Instagram story showing clips from a rap video that had been uploaded to YouTube." (Id. ¶ 6(b)) The video "features a rapper whose build and facial features match the still shot of the shooter identified as FRANCIS." (Id.) (emphasis in original) In particular, both the shooter and the rapper sport a goatee and "cornrows or braids"; have a heavy chain or necklace around their neck; are wearing a Chicago White Sox baseball cap with a 2005 World Series logo; and wear the baseball cap's bill turned slightly to the right. (Id.)

## B.    Supplemental Allegations in Callinan Affidavit

In his affidavit, Det. Callinan reports that cell-site data "for a telephone number associated with FRANCIS is consistent with FRANCIS's cellphone being at or in the vicinity of the bodega at or near the time of the shooting." (Callinan Aff. (Dkt. No. 39-5) ¶ 10(d) (emphasis in original))

4

Moreover, "surveillance footage shows that after the shooting, FRANCIS fled South on Alexander [Avenue], crossed over Bruckner [Boulevard], turned east on 132nd Street, and entered a parking garage [located at 331 East 132nd Street]." (Id. ¶ 10 (emphasis in original)) The parking garage at 331 East 132nd Street "is connected to several residential buildings," including 1105 Willis Avenue, where the subject apartment is located. According to Det. Callinan, surveillance footage from the parking garage shows Francis – after the shooting – "moving through the parking garage towards the entrance of 1105 Willis Avenue." (Id. ¶¶ 10(b)-(c))

As to Francis's connection with Apartment 5D, Det. Callinan states that "GPS data collected from a telephone number associated with FRANCIS is consistent with FRANCIS's cellphone being at or in the vicinity of the Subject Premises almost every evening and often in the afternoon." (Id. ¶ 11 (emphasis in original))

Callinan also recounts the events that transpired on October 10, 2024, when officers arrived at Apartment 5D, 1105 Willis Avenue:

a. On or about October 10, 2024, law enforcement knocked on the door of the Subject Premises to conduct an arrest of a known resident of the Subject Premises – Destiny Mateo – who had an open bench warrant from the Bronx Criminal Court and a separate open probable-cause-to-arrest "I-Card" for a charge of menacing in the first degree, in violation of New York Penal Law § 120.13. Law enforcement were aware that FRANCIS could be in the Subject Premises as well.

b. After a few minutes, Mateo opened the front door of the Subject Premises and identified herself as "Destiny." Law enforcement asked Mateo to step out of the Subject Premises, and Mateo complied. Law enforcement asked Mateo whether anyone else was in the Subject Premises, and Mateo indicated that her boyfriend, her sister, and one or more children were inside.

c. While the front door was open, law enforcement, who were familiar with the appearance of FRANCIS, saw FRANCIS standing in the doorway of the bedroom of the Subject Premises. Law enforcement called all remaining individuals out of the Subject Premises, including FRANCIS, who complied with the order. Upon seeing FRANCIS exit the Subject Premises, I confirmed based on my participation in this investigation (including my review of his arrest photographs,

5

the surveillance footage from the shooting, and the rap video) that it was FRANCIS who walked out of the Subject Premises.

d. After FRANCIS, Mateo's sister, and two children exited the Subject Premises, I informed FRANCIS that he would be taken to the Courthouse at 500 Pearl Street pursuant to an arrest warrant. At the time, he was wearing a white T-shirt and sweatpants. I had a conversation with FRANCIS about retrieving a sweatshirt for him prior to heading to the Courthouse. FRANCIS indicated that a sweatshirt could be found laying in the bedroom of the Subject Premises and then provided me with directions to the bedroom of the Subject Premises to find a sweatshirt for him.

e. Following FRANCIS's directions about where the bedroom was located, I entered the Subject Premises and went straight back to the bedroom, the door of which was open. Upon entering the bedroom, I looked for a sweater, but all I saw were female clothing, a large bag containing what appeared to be folded male clothing, male shoes, and a chain that was laying on or near an air conditioner unit. The chain appeared to be consistent with the chain seen in both the rap video and the surveillance footage of the shooting. After I was unable to find a sweater in plain view, I immediately left the Subject Premises.

(Id. ¶¶ 12(c)-(e))  Police then secured the premises in preparation for obtaining a search warrant. (Id. ¶ 12(f))

Based on these facts – and "training and experience" indicating that "individuals who illegally possess and carry firearms and ammunition routinely store such firearms and ammunition where they stay or live" (id. ¶ 14) – Callinan asserts that there is probable cause to believe that Francis "went to the Subject Premises shortly after the shooting and therefore brought any weapons, clothes, and electronic devices on his person with him into the Subject Premises [at that time]," "including the chain and other clothing FRANCIS wore when he committed the shooting that is part of the Subject Offense; the cellphone he had on him before, during, and after the shooting; and the firearm that was used to commit the shooting and ammunition matching the caliber used in the shooting. (Id. ¶¶ 13-14 (emphasis in original))

### C.  Issuance and Execution of the Search Warrant

On the basis of the Complaint and the Callinan Affidavit, Judge Lehrburger issued the requested search warrant for Apartment 5D, 1105 Willis Avenue, on October 10, 2024. (See Search Warrant (Dkt. No. 39-5))

Later that day, officers executed the search warrant and "found a Ruger LCP. 380 pistol loaded with six rounds of ammunition" inside Apartment 5D.  (Govt. Opp. (Dkt. No. 40) at 11; see also Indictment (Dkt. No. 23) ¶ 2)  It is undisputed that "the firearm seized on October 10[, 2024 from Apartment 5D] fired [at least] one of the shell casings recovered from the scene of the September 18 shooting."  (Id.; see also Def. Br. (Dkt. No. 38) at 5 ("Ballistics testing later confirmed that the firearm seized on October 10 fired the shell casings recovered from the bodega scene."))

## II.  INDICTMENT

On March 13, 2025, the Government obtained an indictment charging Francis with felon-in-possession in connection with (1) his alleged possession of two .380 automatic shell casings on September 18, 2024 (Count One); and (2) his alleged possession of a loaded Ruger LCP .380 pistol on October 10, 2024.  (Indictment (Dkt No. 24))

## DISCUSSION

## I.  MOTION TO DISMISS COUNT ONE OR COUNT TWO AS MULTIPLICITOUS

Francis has moved to dismiss either Count One or Count Two as multiplicitous, arguing that these counts charge "a single act of possession – one firearm and its ammunition" –

7

and thereby "expose Mr. Francis to multiple punishments for the same offense." (See Def. Br. (Dkt. No. 38)) at 4, 7)

### A.    Legal Standard

"An indictment is multiplicitous when a single offense is alleged in more than one count. The multiplicity doctrine is based upon the double jeopardy clause of the Fifth Amendment, which 'assur[es] that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.'" United States v. Nakashian, 820 F.2d 549, 552 (2d Cir. 1987) (first citing United States v. Israelski, 597 F.2d 22, 24 (2d Cir. 1979); then quoting Brown v. Ohio, 432 U.S. 161, 165 (1977)). Multiplicitous indictments permit a jury to convict a defendant on two counts when doing so would result in two punishments being imposed for the same crime. See U.S. Const. amend. V ("No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb. . . ."). This concern is particularly acute when an indictment charges that a single "act or transaction constitutes a violation of two distinct statutory provisions." See Blockburger v. United States, 284 U.S. 299, 304 (1932); see also United States v. Kerley, 544 F.3d 172, 178 (2d Cir. 2008) ("'An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed.'" (quoting United States v. Chacko, 169 F.3d 140, 145 (2d Cir. 1999))).

In determining whether an indictment is multiplicitous, a court considers "'whether Congress intended the counts to constitute separate units of prosecution.'" Kerley, 544 F.3d at 178 (quoting United States v. Handakas, 286 F.3d 92, 98 (2d Cir. 2002)) (further quotation marks and citations omitted). "[O]nce Congress has defined a statutory offense by its prescription of the 'allowable unit of prosecution,' that prescription determines the scope of

protection afforded. . . ." Sanabria v. United States, 437 U.S. 54, 69-70 (1978) (internal citations omitted).

The statute at issue here, 18 U.S.C. § 922(g), reads as follows:

> It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g).

The language of Section 922(g) leaves "'[u]ncertainty as to the unit of prosecution intended by Congress.'" United States v. Olmeda, 461 F.3d 271, 279 (2d Cir. 2006) (alteration in original) (quoting United States v. Buchmeier, 255 F.3d 415, 421 (7th Cir. 2001)). As a result, "a convicted felon who simultaneously possesses firearms and rounds of ammunition can generally only be charged with a single violation of § 922(g)." Olmeda, 461 F.3d at 280.

"[M]ultiple charges [under Section 922(g)] may well be warranted[, however,] if the evidence shows that the felon acquired possession of the firearms or ammunition on different occasions, or . . . stored them at different sites." Id. Accordingly, whether an indictment that charges multiple Section 922(g) offenses is multiplicitous turns on the facts of the case – namely, whether the Government can show that the firearms or ammunition were acquired at different times or stored in different locations. See United States v. Glover, No. 23 Cr. 438 (NRB), 2024 WL 4872759, at *2 (S.D.N.Y Nov. 21, 2024) (rejecting as premature arguments that several Section 922(g) counts were multiplicitous, because these arguments "presume facts yet to be established[:] [f]or example, whether defendant acquired the ammunition charged in Count One separately from the ammunition charged in Count Two. . . .")

Moreover, a multiplicitous indictment triggers the protections of the Double Jeopardy Clause only after a defendant has been convicted on the multiplicitous counts. "Where

9

there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed." United States v. Josephberg, 459 F.3d 350, 355 (2d Cir. 2006). Accordingly, where "[n]o convictions have been entered[,] . . . the Double Jeopardy Clause's guarantee against multiple punishments for the same offense has not yet been triggered." United States v. Polouizzi, 564 F.3d 142, 157 (2d Cir. 2009).

"Since Josephberg, courts in this Circuit have routinely denied motions to dismiss potentially multiplicitous counts as premature, prior to conviction." United States v. Medina, No. 13 Cr. 272 (PGG), 2014 WL 3057917, at *3 (S.D.N.Y July 7, 2014) (collecting cases); see also United States v. Maxwell, 534 F. Supp. 3d 299, 322-23 (S.D.N.Y. 2021) (denying motion to dismiss allegedly multiplicitous counts as premature); Glover, 2024 WL 4872759, at *2-3 (ruling that motion to dismiss multiple Section 922(g)(1) counts was premature, because "the Double Jeopardy Clause does not protect a defendant at this preliminary stage"). That is because "the Double Jeopardy clause does not prohibit simultaneous prosecutions for the same offense; it prohibits duplicative punishment." United States v. Mostafa, 965 F. Supp. 2d 451, 464 (S.D.N.Y. 2013).

## B.    Analysis

In arguing that either Count One or Count Two must be dismissed as multiplicitous, Francis contends that "the same firearm and ammunition underlie both counts," which merely "charge[] the same continuous possession of one weapon and its ammunition." (Def. Reply Br. (Dkt. No. 41) at 6 (citing Olmeda, 461 F.3d 271 (2d Cir. 2006); United States v. Pelusio, 725 F.2d 161 (2d Cir. 1983)) According to Francis, "[t]he distinction between [possessing] 'ammunition' on September 18 and [possessing a] 'firearm and ammunition' on

October 10 is semantic, not substantive," and therefore the Double Jeopardy Clause requires the dismissal of one of these counts. (Def. Br. (Dkt. No. 39) at 7; see also Def. Reply Br. (Dkt. No. 39) at 6))

For reasons discussed above, Francis' argument that the Double Jeopardy Clause requires dismissal of either Count One or Count Two is premature. Because Francis has not yet been convicted of either of the allegedly multiplicitous counts, "the Double Jeopardy Clause's guarantee against multiple punishments for the same offense has not yet been triggered." Polouizzi, 564 F.3d at 157.

Olmeda and United States v. Pelusio, 725 F.2d 161 (2d Cir. 1983) – cited by Francis (Def. Br. (Dkt. No. 39) at 6-7) – do not support his argument that the Court is required to resolve his Double Jeopardy claim now. In Olmeda and Pelusio, the defendants had been convicted on allegedly multiplicitous counts. See Olmeda, 461 F.3d at 275-76, 289 (Olmeda was convicted on a Section 922(g) count based on his possession of ammunition on June 13, 2002, in the Eastern District of North Carolina "and elsewhere"; held that later Section 922(g) charge in the Southern District of New York premised on Olmeda's possession of ammunition in his New York apartment on June 19, 2002, was barred by the Double Jeopardy Clause); Pelusio, 725 F.2d at 168 (reversing two counts of conviction; "absent any evidence that the defendants received the .12 gauge shotgun and the five rounds of ammunition on separate occasions, they could not lawfully be found guilty of receipt of the gun and the ammunition as separate crimes forming the subject of multiplicitous counts").

Here, as discussed above, Francis has not yet been convicted of either of the allegedly multiplicitous counts. Accordingly, Francis's rights under the Double Jeopardy Clause have not yet been triggered, and his motion to dismiss will be denied as premature.

11

## II.    MOTION TO SUPPRESS

Francis has moved to suppress evidence obtained from Apartment 5D, asserting that the Callinan Affidavit is "riddled with reckless misstatements and omissions." (Def. Br. (Dkt. No. 39) at 4)  In the alternative, Francis contends that "the Court should conduct a Franks hearing." (Def. Mot. (Dkt. No. 38) at 4)

### A.    Legal Standard

The Fourth Amendment guarantees that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  When reviewing an application for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).  It is well-established that "'[t]here is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant.'" E.g., United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)).  Accordingly, the role of a court reviewing the magistrate judge's issuance of a warrant "is simply to ensure that the 'totality of the circumstances' afforded the magistrate [judge] 'a substantial basis' for making the requisite probable cause determination." United States v. Clark, 638 F.3d 89, 93 (2d Cir. 2011) (quoting Gates, 462 U.S. at 238).

That said, "the deference accorded to a magistrate [judge's] finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based." United States v. Leon, 468 U.S. 897, 914 (1984) (citing Franks v. Delaware, 438 U.S. 154 (1978)).  Indeed, a defendant "may challenge the validity of a search

12

warrant alleged to contain deliberately or recklessly false or misleading information." Martin, 426 F.3d at 73 (citing Franks, 438 U.S. at 164-72). And, in certain circumstances, an evidentiary hearing – referred to as a "Franks hearing" – may be necessary to resolve a defendant's claim that a search warrant affidavit contained false or misleading information.

To justify a Franks hearing,

> a defendant must make a substantial preliminary showing that (1) there were intentional misrepresentations or omissions in the warrant affidavit, or, in other words "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth"; and (2) those misrepresentations or omissions were material, or "necessary to the issuing judge's probable cause finding."

United States v. Nejad, 436 F. Supp. 3d 707, 718-19 (S.D.N.Y. 2020) (emphasis in original) (quoting United States v. Rajaratnam, 719 F.3d 139, 146 (2d Cir. 2013) and citing Franks, 438 U.S. at 155-56).

Conclusory allegations of misrepresentations or omissions will not suffice to satisfy this burden. A defendant must instead offer "[a]ffidavits or sworn or otherwise reliable statements of witnesses . . . , or their absence [must be] satisfactorily explained." Franks, 438 U.S. at 171.

In determining whether a search warrant affidavit contains a "knowing or reckless falsity," courts have acknowledged that "'[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.'" United States v. Awadallah, 349 F.3d 42, 67-68 (2d Cir. 2003) (quoting United States v. Colkley, 899 F.2d 297, 300-01 (4th Cir. 1990)). Moreover, "'every statement in a warrant affidavit does not have to be true.'" Martin, 426 F.3d at 73 (quoting United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000)). It is only when a defendant provides properly supported "allegations of deliberate

falsehood or of reckless disregard for the truth" that a <u>Franks</u> hearing may be necessary. <u>Franks</u>, 438 U.S. at 171.

Even where a defendant demonstrates that a search warrant affidavit contains falsehoods or omissions, however, "no hearing is required" where the remaining content is sufficient "to support a finding of probable cause." <u>Id.</u> In assessing whether the falsehoods or omissions are material – that is, "'necessary to the [issuing] judge's probable cause finding'" – a court must "'disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant.'" <u>United States v. Klump</u>, 536 F.3d 113, 119 (2d Cir. 2008) (alterations in original) (quoting <u>Canfield</u>, 212 F.3d at 718) "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" <u>Awadallah</u>, 349 F.3d at 65 (quoting <u>Canfield</u>, 212 F.3d at 718).

B.    <u>**Alleged False Statements and Material Omissions**</u>

Francis contends that the Callinan Affidavit contains the following material misrepresentations:

(1)    Callinan states in his affidavit that Francis's "general build and the clothing that he wore at the time he committed the shooting – including a chain around his neck – matched the clothing he wore when filming a rap video." (Callinan Aff. (Dkt. No. 39-5) ¶ 8) According to Francis, however, "the surveillance footage shows no chain; the bodega shooter appears to be wearing grey headphones around his neck." (Def. Br. (Dkt. 39) at 8 (citing Ex. F (Still Shot of Surveillance Footage) (Dkt. No. 39-6)) Francis later posits that "the footage from the shooting appears to depict a gray rope or sweatshirt neckline around the shooter's neck – not a big, gold chain, as Detective Callinan indicated in the search-warrant affidavit." (Def. Reply Br. (Dkt. No. 41) at 4)

(2)    Callinan states in his affidavit that, "[u]pon entering the bedroom" of the apartment, he saw "a chain that was laying on or near an air conditioner unit. The chain appeared to be consistent with the chain seen in both the rap video and the surveillance footage of the shooting." (Callinan Aff. (Dkt. 39-5) ¶ 12(d)) Francis argues that, "[b]ecause the shooter wore no chain, this assertion collapses and

14

serve[s] only to bolster a tenuous link between Mr. Francis and the firearm." (Def. Br. (Dkt. No. 39) at 9)

(3)     Callinan states in his affidavit that "Mateo opened the front door of the Subject Premises and identified herself as 'Destiny.' Law enforcement asked Mateo to step out of the Subject Premises, and Mateo complied." (Callinan Aff. (Dkt. No. 39-5) ¶ 12(b)) Francis offers affirmations from Mateo and her sister – Diana Reyes – asserting that Reyes – not Mateo – opened the door to speak with the officers, and that Reyes did not identify herself as "Destiny." (See Reyes Aff. (Dkt. No. 41-1); Mateo Aff. (Dkt. No. 41-2)) Francis further argues that body-worn camera footage confirms that it was Reyes who opened the door to speak with the officers. (Def. Br. (Dkt. No. 39) at 9 (citing Ex. D (Body-Worn Camera Footage) (Dkt. No. 39-3) at 1:55-3:33))[1]

As to material omissions, Francis complains that the Callinan Affidavit does not disclose that (1) "the officers' true purpose was to seize [Francis], not to execute a bench warrant for Ms. Mateo" (Def. Reply Br. (Dkt. No. 41) at 3); and (2) neither Mateo nor Reyes consented to leaving the apartment or to the officers' subsequent search of the apartment. (See Def. Br. (Dkt. No. 39) at 6 ("Body-worn camera footage shows Ms. Mateo exiting last, disputing the officers' presence, while Mr. Francis emerged first – undermining any claim of consent."); Def. Reply Br. (Dkt. 41) at 4 (arguing that "consent was [not] given" by either Reyes or Mateo))

As discussed above, a defendant seeking an order suppressing evidence based on false statements or material omissions in a search warrant affidavit must demonstrate that the affiant presented "deliberate falsehood[s] or [statements made in] reckless disregard for the truth," and that "the alleged falsehoods or omissions were necessary to the judge's probable cause finding." United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998) (citing United States v. Levasseur, 816 F.2d 37, 43 (2d Cir. 1987). "'Recklessness may be inferred where the omitted

---

[1] In his reply brief, Francis contends that "Detective Callinan's affidavit misrepresented" that "[o]fficers entered and began searching before Ms. Mateo exited, contradicting the claim that they were 'invited in.'" (Def. Reply Br. (Dkt. No. 41) at 3) The Callinan Affidavit does not say that anyone inside the apartment authorized the officers to enter, however, let alone "invited [them] in."

[or misrepresented] information was clearly critical to the probable cause determination.'" United States v. Lambus, 897 F.3d 368, 400 (2d Cir. 2018) (emphasis omitted) (quoting Rajaratnam, 719 F.3d at 153). And "[r]eckless disregard for the truth may be established by demonstrating that an affiant made statements which failed to take account of the facts as he knew them, or which he seriously doubted were true." Nejad, 436 F. Supp. 3d. at 719 (citation and quotation marks omitted).

"[A]ll storytelling involves an element of selectivity, [however,] and it is therefore not necessarily constitutionally significant that an affidavit omits facts which, in retrospect, seem significant." United States v. Lahey, 967 F. Supp. 2d 698, 708 (S.D.N.Y 2013) (citation omitted); see also United States v. DeFilippo, No. 17cr585, 2018 WL 740727, at *2 (S.D.N.Y. Jan. 31, 2018) ("[a]s courts in this Circuit have recognized, it is not shocking that every affidavit will omit facts which, in retrospect, seem significant") (citation, quotation marks, and alteration marks omitted).

Finally, misrepresentations or omissions caused by "'negligence or innocent mistake'" will not suffice to justify suppression. See Rajaratnam, 719 F.3d at 153 (alteration in original) (quoting Franks, 438 U.S. at 171).

Where a defendant seeking suppression proffers substantial evidence that alleged misstatements and omissions in a search warrant affidavit were deliberate falsehoods or made with reckless regard for the truth, the defendant must then go on to demonstrate that those misstatements or omissions were material to the probable cause determination. As noted above, in determining whether alleged misstatements or omissions are material, a court considers "whether, after putting aside erroneous information and material omissions, 'there remains a

residue of independent and lawful information sufficient to support probable cause.'"

Awadallah, 349 F.3d at 65 (quoting Canfield, 212 F.3d at 718).

### C.    Whether the Callinan Affidavit Contains Deliberate Falsehoods or Reckless Statements Material to the Probable Cause Determination

#### 1.    Allegation that the Shooter Was Wearing a Chain or Necklace

The first alleged deliberate falsehood cited by Francis is Callinan's assertion – in his affidavit and in the Complaint – that the still photo taken from the surveillance footage shows that the shooter wore a chain or necklace similar to the chain worn by Francis in the rap video and observed in Apartment 5D.  (Def. Br. (Dkt. No. 39) at 8 (citing Callinan Aff. (Dkt. No. 39-5) ¶ 8))

As an initial matter, it is not clear from the still photo what the shooter is wearing around his neck.  Indeed, in his initial brief, Francis says that the "shooter appears to be wearing grey headphones around his neck" (id. (citing Ex. F (Still Shot of Surveillance Footage) (Dkt. No. 39-6))), while in his reply brief, Francis says that the surveillance footage shows a "gray rope or sweatshirt neckline" around the shooter's neck.  (Def. Reply (Dkt. No. 41) at 4)  It may be that the still photo shows neither, and that the lighter-colored material around the shooter's neck are white drawstrings for the shooter's hoodie.  In any event, it is not clear what is around the shooter's neck.

Having said that, Francis has not demonstrated that the chain or necklace assertion in Callinan's affidavit and in the Complaint constitutes a deliberate falsehood or reckless statement, much less a falsehood that was material to the probable cause determination.

Callinan did not merely characterize what is shown in the still photo; the still photo taken from the surveillance footage is provided in the Complaint, which is attached as Exhibit A to the Callinan affidavit.  (Callinan Aff. (Dkt. No. 39-5), Ex. A at 4)  Accordingly, the

magistrate judge would have made his own determination as to whether the photo of the shooter appeared to show a chain or necklace around the shooter's neck. The fact that Callinan provided the photo on which his assertion was based tends to rebut any intent to mislead the magistrate judge.

As to materiality, a corrected affidavit would omit any claim that the shooter was wearing a chain or necklace that resembled the chain shown in the music video and observed by Callinan in Apartment 5D.[2] Even absent the assertion that the shooter appeared to be wearing a chain or necklace similar to the chain Callinan observed in the music video and inside Apartment 5D, however, the search warrant provided an ample basis for finding probable cause. Stated another way – even absent the allegation concerning the chain the shooter was wearing – the Callinan affidavit sets forth facts demonstrating "a fair probability that contraband or evidence of a crime [would] be found in [Apartment 5D]." See Gates, 462 U.S. at 238.

Among the facts demonstrating probable cause are the following: First, there is Det. Callinan's assertion that Francis's U.S. probation officer had "reviewed a still shot taken from surveillance footage of the Shooter . . . and identified the Shooter as FRANCIS. . . ." (Callinan Aff. (Dkt. No. 39-5) ¶ 5 (emphasis in original)) Second, there is Callinan's assertion that "cell-site data for a telephone number associated with FRANCIS is consistent with FRANCIS's cellphone being at or in the vicinity of the bodega at or near the time of the shooting." (Id. ¶¶ 7, 10(d) (emphasis in original))

---

[2] The corrected affidavit would, however, include the assertion that the chain worn by Francis in the music video resembles the chain observed by Det. Callinan in Apartment 5D. This allegation remains relevant to the probable cause determination, because the fact that Callinan observed in Apartment 5D what appeared to be the same chain that Francis is wearing in the music video suggests that (1) Francis was staying at Mateo's apartment; (2) he may have fled there after the shooting; and (3) as a result, evidence relevant to the shooting might be found in Mateo's apartment.

Callinan's affidavit also demonstrates that Francis is the performer seen in the music video (Callinan Aff. (Dkt. No. 39-5), Ex. A ¶ 6(a)-(b)), and that a comparison of still photos taken from the surveillance footage and the music video show significant similarities between the individuals shown in the surveillance footage and the music video – not just as to general appearance and build – but as to a number of distinctive features, including a goatee and the "wearing [of] a Chicago White Sox baseball cap with a logo of a globe and 'WORLD SERIES 05' on the left side (middle)." (Id., Ex. A, ¶¶ 4, 6-8)  The shooter and Francis – as seen in the music video – wear the 2005 White Sox World Series cap in the same distinctive fashion – with "the bill of the baseball cap turned slightly towards the right side, [displaying] the tips of [the wearer's] cornrows or braids." (Id., Ex. A, ¶ 6(b))

There is also the surveillance footage showing the shooter – after the shooting – entering a parking garage that serves – among other apartment buildings – 1105 Willis Avenue, which contains Apartment 5D.  According to Callinan, the surveillance footage shows the shooter "moving through the parking garage towards an entrance to [1105] Willis Avenue." (Id. ¶ 4)  And the affidavit further represents that "GPS data collected from a telephone number associated with FRANCIS" during the period between October 5, 2024 and October 9, 2024 "is consistent with FRANCIS's cellphone being at or in the vicinity of [Apartment 5D] almost every evening and often in the afternoon." (Id. ¶ 11) (emphasis in original)

There is also the fact that when police officers arrived at Apartment 5D on October 10, 2024 – the day the search warrant was obtained – they found Francis inside the apartment in a tee-shirt and sweatpants. (Id. ¶ 12)

In sum, even absent the allegation that the shooter was wearing a chain similar to that found in Apartment 5D, the Callinan affidavit provides ample probable cause to believe that

19

Apartment 5D contained evidence of Francis's alleged felon-in-possession violation. The facts set forth in the Complaint and affidavit indicate that Francis was the shooter, that he likely fled to Mateo's apartment after the shooting, and that he was staying in Apartment 5D at that time. Finally, there is the assertion – based on Det. Callinan's "training and experience" – that "individuals who illegally possess and carry firearms and ammunition routinely store such firearms and ammunition where they stay or live." (Id. ¶ 14) These allegations are sufficient to demonstrate probable cause to believe that Apartment 5D would contain evidence of Francis's possession of a firearm and ammunition. See Franks, 438 U.S. at 171.

### 2. Assertion that Destiny Mateo Opened the Door to Apartment 5D

As discussed above, Det. Callinan states in his affidavit that "Mateo opened the front door of [Apartment 5D] and identified herself as 'Destiny.' Law enforcement asked Mateo to step out of the [apartment], and Mateo complied." (Callinan Aff. (Dkt. No. 39-5) ¶ 12(b)) Francis had submitted affirmations from Mateo and her sister – Diana Reyes – stating that it was Reyes who answered the door, and that Reyes did not identify herself as Destiny. (See Reyes Aff. (Dkt. No. 41-1); Mateo Aff. (Dkt. No. 41-2)).

In moving to suppress, Francis contends that Det. Callinan intentionally or recklessly misrepresented that Destiny Mateo opened the door of Apartment 5D in response to the officers' knocking. According to Francis, "it was Ms. Reyes, Mateo's sister, who opened the door and [she] said only 'Desteny' when asked the family name." (Def. Reply Br. (Dkt. No. 41) at 3)

Assuming that Det. Callinan incorrectly identified the woman who opened the door to Apartment 5D, Francis has not proffered facts showing that Callinan made this error intentionally or recklessly. Indeed, there is no evidence that Det. Callinan ever learned – prior to

the motion to suppress – that Reyes, and not Mateo, opened the door. Nor has Francis articulated any motive Callinan would have for intentionally misidentifying Reyes as Mateo. In sum, Francis has not shown that Det. Callinan deliberately or recklessly misrepresented in his affidavit the identity of the woman who answered the door.

Nor does the misidentification of Reyes as Mateo have any bearing on the probable cause determination. Indeed, all of the facts discussed above that provide probable cause to believe that Apartment 5D would contain evidence of Francis's felon-in-possession offense remain in place, even if Det. Callinan misidentified Mateo as the woman who opened the apartment door in response to the officers' knocking.

### 3.    Alleged Omissions

As discussed above, Francis contends that Det. Callinan should have disclosed in his affidavit that (1) "the officers' true purpose was to seize [Francis], not to execute a bench warrant for Ms. Mateo" (Def. Reply Br. (Dkt. No. 41) at 3); and (2) neither Mateo nor Reyes consented to leaving the apartment or to the officers' subsequent search of the apartment. (See Def. Br. (Dkt. No. 39) at 6 ("Body-worn camera footage shows Ms. Mateo exiting last, disputing the officers' presence, while Mr. Francis emerged first – undermining any claim of consent."); Def. Reply Br. (Dkt. 41) at 4 (arguing that "consent was [not] given" by either Reyes or Mateo))

But the circumstances of the officers' approach to Apartment 5D are disclosed in Det. Callinan's affidavit. While Callinan states that officers had a "bench warrant" for Destiny Mateo – a "known resident of [Apartment 5D]" – for menacing, he also discloses that "[l]aw enforcement were aware that FRANCIS could be in the Subject Premises as well." (Callinan Aff. (Dkt. No. 39-5) ¶12(a) (emphasis in original) Accordingly, to the extent that Francis argues that the use of and reference to the bench warrant for Mateo was pretextual – and that the

21

officers' true motivation for knocking on the door of Apartment 5D was to arrest Francis – the surrounding circumstances were disclosed to the magistrate judge in the search warrant affidavit. Moreover, Francis's pretext argument has no bearing on whether there was probable cause to believe that Apartment 5D contained evidence of Francis's felon-in-possession offense.

As to Francis's arguments regarding Mateo and Reyes's lack of consent, the short answer is that Det. Callinan does not assert in his affidavit that Mateo or Reyes consented to any search of Apartment 5D.[3] Callinan instead reports that officers "asked Mateo to step out of the Subject Premises, and Mateo complied." (Id. ¶ 12(b)) Officers then "asked Mateo whether anyone else was in the Subject Premises, and Mateo indicated that her boyfriend, her sister, and one or more children were inside." (Id.) With the front door to Apartment 5D open, officers observed Francis inside. Officers then directed all who remained inside the apartment to step out, and Francis and the others inside the apartment "complied with the order." (Id. ¶ 12(c)) In sum, neither Mateo nor Reyes were asked to consent to a search of Apartment 5D, and Det. Callinan does not contend in his affidavit that either consented to a search of the apartment.

As discussed above, after Francis walked out of Apartment 5D, he was placed under arrest. (Id. ¶ 12(d)) At that time, he was wearing only a tee-shirt and sweatpants. (Id.; see also Reyes Aff. (Dkt. No. 41-1) ¶ 6) Given that the arrest was taking place in mid-October, Det. Callinan asked Francis whether he wanted to take a sweatshirt with him. (Callinan Aff. (Dkt. No. 39-5) ¶ 12(d)) Francis told Callinan that he could retrieve a sweatshirt from a bedroom in Apartment 5D, and explained where the sweatshirt could be found. (Id.) Det. Callinan then

---

[3] Ironically, it is Mateo who states in her affirmation that she "heard someone – possibly me – say something like 'you guys can come in[]'" to the officers standing outside her apartment. (Mateo Aff. (Dkt. No. 41-2) ¶ 4) Reyes likewise reports that "someone may have said 'you guys can come in.'" (Reyes Aff. (Dkt. No. 41-1) ¶ 4)

22

entered the apartment and "went straight back to the bedroom." He could not "find a sweater in plain view," however, and "immediately left the Subject Premises." (Id. ¶ 12(e))

In sum, Francis's argument that Mateo and Reyes did not consent to a search of Apartment 5D is irrelevant, both because the Callinan Affidavit does not claim that they provided any such consent, and because their lack of consent has no bearing on whether there was probable cause to believe that Apartment 5D contained evidence of Francis's felon-in-possession offense.

*    *    *    *

This Court concludes that Francis has not made the "substantial preliminary showing that . . . 'the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth,'" nor has he shown that any such inaccuracy or omission was material. See Nejad, 436 F. Supp. 3d at 718-19 (quoting Rajaratnam, 719 F.3d at 146). Accordingly, Francis's motion to suppress will be denied.

## CONCLUSION

For the reasons stated above, Francis's motion to dismiss and motion to suppress (Dkt. No. 38) are denied.

Dated: New York, New York
      December 9, 2025

SO ORDERED.

Paul G. Gardephe
United States District Judge

23