UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

DEVONTE FRANCIS,

Defendant.

**MEMORANDUM**
**OPINION & ORDER**

25 Cr. 103 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Devonte Francis pleaded guilty to possessing ammunition after a felony conviction, in violation of 18 U.S.C. § 922(g)(1), and awaits sentencing. (April 13, 2026 Minute Entry) Francis's possession of ammunition arises out of a September 18, 2024 shooting that he committed outside the Good Times Deli located at 133 Alexander Avenue in the South Bronx. (See May 12, 2026 Hearing Tr. (Dkt. No. 73) at 2)[1]

The Government contends that Francis's shooting constitutes either attempted first degree murder or attempted second degree murder under U.S.S.G. § 2A2.1(a)(1) and (2) (Govt. Br. (Dkt. No. 68) at 19-25), while Francis argues that the shooting amounts to only aggravated assault under U.S.S.G. § 2A2.2. (Def. Opp. (Dkt. No. 69) at 4-12)

On May 12 and 13, 2026, this Court conducted a hearing pursuant to United States v. Fatico, 603 F.2d 1053 (2d Cir. 1979) concerning this issue.

For the reasons stated below, this Court concludes that the Government has not proven by a preponderance of the evidence that Francis committed attempted first degree murder or attempted second degree murder under U.S.S.G. § 2A2.1(a)(1) and (2). Accordingly,

[1] Citations to transcript pages correspond to the pagination assigned by the court reporter. All other citations refer to the page numbers designated by this District's Electronic Case Files ("ECF") system.

Francis's Sentencing Guidelines range will instead be premised on the aggravated assault provision found in U.S.S.G. § 2A2.2.

## BACKGROUND

## I. PLEA AGREEMENT AND GUILTY PLEA

On March 13, 2025, the Government obtained an indictment charging Francis with two counts of felon in possession of ammunition. (Indictment (Dkt. No. 24)) On March 25, 2026, Francis entered into a plea agreement in which he agreed to plead guilty to Count One of the Indictment, which charges that Francis possessed ammunition after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). (Plea Agmt. at 1)

With respect to Francis's offense level under U.S.S.G. § 2K2.1, the plea agreement states that "[t]he Government's position is that the conduct underlying Count One constitutes attempted murder in the first degree, pursuant to U.S.S.G. § 2A2.1(a)(l)," while "[t]he defendant's position is that the conduct underlying Count One constitutes aggravated assault, pursuant to U.S.S.G. § 2A2.2." (Id. at 3)

On April 13, 2026, Francis pleaded guilty to Count One of the Indictment. (See April 13, 2026 Tr. (Dkt. No. 71) at 3-20) During the Rule 11 proceeding, Francis allocuted as follows:

> On or about September 18, 2024, in the Southern District of New York, I knowingly possessed ammunition, which was in . . . interstate commerce. Before that date I had previously been convicted of a crime punishable by more than one year in prison and I knew that I would not possess the ammunition – I should not have possessed ammunition that date, and I plead guilty because I am guilty.

(Id. at 17-18) Francis also stated that he possessed the ammunition while in "Bronx County," and admitted to (1) "a prior conviction from 2022 for racketeering conspiracy in this [D]istrict"; and (2) "a 2019 conviction for attempted robbery in the second degree in Bronx County." (Id. at 18) The Government then proffered that if Francis "were to go to trial, [the Government] would

have an expert who would testify that the ammunition was manufactured outside of New York state and therefore, because it was possessed within New York state, it would have affected interstate commerce." (Id.)

At the close of the April 13, 2026 Rule 11 proceeding, this Court scheduled a Fatico hearing for May 12, 2026 to determine whether Francis – in connection with the instant offense – had engaged in conduct that constitutes either attempted murder in the first degree or attempted murder in the second degree. (See id. at 20-21; Order (Dkt. No. 60))

## II. ***FATICO* HEARING**

The Fatico hearing took place on May 12 and 13, 2026.

At the hearing, the Government called Daniel Callinan – a detective in the New York City Police Department ("NYPD") who serves with the Federal Bureau of Investigation's Metropolitan Safe Streets Task Force. (May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 5-6) The Government also introduced seven videos containing surveillance camera footage shot inside and outside the deli; a music video featuring Francis; and a prison recording of a call between Francis and his mother. (GX 101-GX 107; GX 201; GX 401)

Defense counsel called two witnesses at the hearing: (1) Daniel Sierra, who was working at the Good Times Deli on the day of the shooting (May 12, 2026 Hearing Tr. (Sierra Testimony) (Dkt. No. 73)); and (2) Francis. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75)) Defense counsel also introduced an NYPD report containing a summary of an anonymous witness statement. (DX A)

### A. The Government's Evidence

#### 1. Det. Callinan's Testimony

Det. Callinan has 18.5 years of service in the NYPD. (May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 5-6) His work on the Safe Streets Task Force focuses on "long-term violence cases," including gang violence. (Id. at 6)

Callinan testified that Francis is a member of a "local gang" known as the "6[-]3 Taliban." (Id. at 13, 19) According to Callinan, members of the 6-3 Taliban also belong to two larger Bloods gangs: the Mac Ballers and the Bloodhound Brims. (Id. at 51) The "6-3" in the gang's name refers to 163rd Street; the gang's "home base" is at the intersection of 163rd Street and Morris Avenue in the Bronx. (Id. at 13) Members of the 6-3 Taliban engage in "[r]obberies, drug dealing and [associated] violence[,] . . . shootings, [and] stabbings." (Id. at 21) Gang members use FaceTime and "end-to-end encrypted chats" when messaging to avoid police surveillance, and the gang employs "lookouts" while selling drugs. (Id. at 106-07) Gang members also use a distinctive 6-3 "hand sign." (Id. at 29 ("So the 6[-]3 hand sign would be the thumb and index finger making like the OK sign with the middle finger extended. That makes a six and with the three remaining open fingers makes a three."))

Callinan has investigated "30 members and associates" of the 6-3 Taliban as part of his Task Force work. (Id. at 12-13) He has also participated in the arrests of "three or four" gang members and interviewed other 6-3 Taliban members and associates. (Id. at 13, 19)

Callinan determined that Francis is a member of the 6-3 Taliban based on the contents of his Instagram account, "numerous debriefings of other members of 6[-]3 Taliban, cell

phone search warrant returns, [recorded] jail calls, [and] other videos that are up for public viewing on YouTube."[2] (Id. at 16-19)

Two rival gangs – the "280 Crips" and the "Courtlandt OGs" – operate in territory neighboring that of the 6-3 Taliban. (Id. at 20) 6-3 Taliban members refer to rival gangs as "opposition" or "opps."[3] The 280 Crips have "their main home base" at East 170th Street and College Avenue in the Bronx," with "a subset [of the gang operating] on Kingsbridge Avenue." (Id.) The Courtlandt OGs are based in the "Melrose and Jackson housing developments on Courtlandt Avenue in the South Bronx." (Id. at 20-21)

Callinan testified that he was not aware of any evidence that Francis was "look[ing] for opps" in the early afternoon of September 18, 2024, when the shooting took place. (Id. at 97) Callinan believes that Francis was instead simply "going to the deli" to get a sandwich. (Id.)

---

[2] In an earlier case in this District, Francis was charged with racketeering conspiracy, assault with a dangerous weapon in aid of racketeering, Hobbs Act Robbery, use of a firearm in furtherance of a crime of violence, and narcotics trafficking based on his involvement with the Mac Ballers Bloods gang between 2015 and March 2020. (Indictment (Dkt. No. 1) ¶¶ 1-12, 23-30, United States v. Lewis et al., 20 Cr. 234 (LAP) (S.D.N.Y. Mar. 26, 2020)) On September 14, 2022, Francis pled guilty to racketeering conspiracy (September 14, 2022 Minute Entry, United States v. Lewis et al., No. 20 Cr. 234 (LAP) (S.D.N.Y. Sept. 14, 2022)), and on May 24, 2023, he was sentenced to four years' imprisonment and five years' supervised release. (Judgment (Dkt. No. 144) at 2-3, United States v. Lewis et al., No. 20 Cr. 234 (LAP) (S.D.N.Y. May 24, 2023)) He was released from prison in April 2024 and began his supervised release term at that time. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 3-5)

[3] Callinan testified that "opp" or "opposition" refers to a person's enemies. (May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 49-50; see also id. at 21-22 (Callinan testifying that "cell phone returns" from 6-3 Taliban members contain discussion "about being on the lookout for opposition[]") Francis testified that "op[p]" means "people I don't see eye to eye with" or "[p]eople that I'm not cool with." (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 63)

### 2. Surveillance Camera Footage

The Government introduced seven videos of surveillance camera footage taken inside and outside the Good Times Deli, 133 Alexander Avenue in the South Bronx in the early afternoon of September 18, 2024.[4] (May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 52 (citing GX 101-GX 107)) These videos show Francis's encounter with two other young men inside the deli, as well as the shooting that subsequently took place outside the deli.

Francis walks into the deli at 12:42:11 p.m. (GX 101 at 16:56-17:15) and proceeds to the deli counter. (GX 103 at 17:24-18:26; GX 104 at 17:10-17:21) Daniel Sierra is working as the cashier at the deli counter. (GX 104 at 17:10-17:21) Francis is wearing a distinctive black Chicago White Sox baseball cap with a 2005 World Series insignia; he wears the cap with the brim tilted to the left of his face. (GX 103 at 18:26)

At 12:42:59 p.m., Jesus Batista and Leonard Romin arrive at the deli in a black vehicle and park across the street. Both men get out of car.[5] (GX 101 at 17:58-18:30; GX 102 at 17:40-18:30) Batista places his left hand inside the waistband of his sweatpants as he exits the vehicle. (GX 101 at 17:58-18:30)

At 12:43:37 p.m., Batista and Romin walk inside the deli towards the back of the store. (GX 107 at 0:37-0:50) The men exchange glances with Francis after entering the store.[6] (Id.; GX 103 at 18:37-18:50) Batista and Romin walk past Francis, with Batista's hand

---

[4] The deli is not located in a neighborhood associated with the 6-3 Taliban, the 280 Crips, or the Courtlandt OGs. (Id. at 63-66)

[5] Callinan testified that his Task Force colleague – Detective Boyer – recognizes Batista and Romin from his work on "the 280 Crips case." (May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 25-26) Batista also provided "pedigree information to medical professionals after he was shot." (Id.)

[6] Callinan is not aware of any evidence suggesting that Francis knew Batista or Romin prior to the shooting or that he was aware that they were associated with the 280 Crips. (Id. at 98)

remaining in his waistband. (GX 103 at 18:37-18:50) Batista and Romin then begin browsing the refrigerated section at the back of the deli. (Id. at 18:46-19:04) Francis again glances at the two men, looking away when Batista turns back to look at Francis. (Id.)

At 12:44:20 p.m., Batista and Romin walk out of the deli. (Id.; GX 107 at 1:20-1:38) Francis does not speak with either man while they are inside the store. (See GX 103 at 18:46-19:04)

Batista and Romin linger on the sidewalk outside the deli after leaving the store. (GX 101 at 19:15-21:20; GX 102 at 19:15-21:20) The two men speak to each other and on their phones during this time. (GX 102 at 19:15-21:20) Batista and Romin also intermittently look inside the deli during this period. (Id.) Batista's left hand remains inside of his waistband for much of the time. (Id.)

Meanwhile, inside the deli, Francis waits for his sandwich. He periodically looks outside of the deli through the glass door. Francis chats with Sierra and pays for his sandwich. (GX 105 at 19:29-19:51) Francis then removes his headphones and places his right hand in the pocket of his hoodie, where he is holding a gun. (Id. at 19:51-20:10)

At 12:46:11 p.m., Francis walks towards the front of the store and appears to look outside to see whether Batista and Romin are waiting for him. (Id. at 20:10-21:19; GX 107 at 03:27-03:48) Batista and Romin are still standing outside of the deli when Francis walks to the front of the store. (GX 101 at 21:00-19; GX 102 at 21:20-21:45) After a few seconds, Romin walks across the street while Batista remains at the edge of the sidewalk. (GX 101 at 21:20-21:45; GX 102 at 21:20-21:45) Francis then returns to the deli counter to pick up his sandwich from Sierra. (GX 105 at 21:21-21:35)

Meanwhile, across the street, Romin opens the driver's side door of the black car and reaches into the car for about three seconds. (GX 101 at 21:24-21:27) Romin then meets Batista in the middle of the street, after which the two men return to the sidewalk outside the deli. (Id. at 21:27-21:45)

At 12:46:34 p.m., Francis picks up his sandwich at the deli counter with his left hand and walks to the front door of the deli. (GX 105 at 21:35-21:40; GX 107 at 3:47-4:00) Francis's right hand remains in the pocket of his hoodie where he is holding a gun. (Id.)

Francis walks out of the front door of the deli at 12:46:42 p.m. (GX 101 at 21:41-21:45) Batista and Romin approach Francis from Francis's left side as soon as he exits the store. (GX 101 at 21:35-21:48; GX 102 at 21:39-21:48; GX 107 at 3:53-4:00) Francis does not acknowledge the men; he instead looks and walks to the right, towards Bruckner Boulevard. (GX 101 at 21:35-21:45)

As Batista and Romin approach Francis on his left side, Romin flashes an upside-down version of the 6-3 Taliban's hand sign. (GX 101 at 21:35-21:44)[7] It is not clear from the surveillance camera footage whether Francis saw Romin making the inverted gang sign. (See May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 102 (Callinan testifying that he is not aware of any evidence showing that "Francis even saw [Romin] flash that sign")) The two men continue to approach Francis, who turns to look at them while backpedaling away. (GX 101 at 21:44-21:51) Francis appears to speak with Batista and Romin at this point. (Id.)

---

[7] (See also May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 52 (testifying that the signal Romin flashed at Francis is an "inverted" version of the hand sign that is "specific to 6[-]3 [Taliban]")) Flashing an upside-down version of a gang signal is a sign of disrespect to that gang. (See id. at 29, 52)

At 12:46:49 p.m., Francis pulls a firearm out of his hoodie pocket. (GX 101 at 21:49-21:51) Batista and Romin see the firearm and turn to flee. (Id.) Batista begins running north on Alexander Avenue, while Romin turns towards the door of the deli. (Id.)

As Batista turns to flee, Francis fires a shot in his direction. (GX 101 at 21:50-21:52) The bullet strikes Batista in his left buttock. (Id. at 21:50-54)[8] Batista is standing about 12.5 feet away from Francis when he is shot.[9] (GX 101 at 21:49-21:52 (showing that Francis is standing approximately 2.5 sidewalk flags away from Batista when he shoots Batista)) After Francis fires the first shot, Romin opens the door to the deli, sprints inside, and hides at the back of the store. (GX 101 at 21:49-21:52; GX 103 at 21:53-22:15; GX 104 at 21:43-22:22)

Meanwhile, the surveillance footage shows Batista running northbound on Alexander Avenue towards 134th Street. He is running with a limp. (GX 101 at 21:50-21:54; GX 102 at 21:51-22:00)

Francis continues backpedaling after firing his first shot. (GX 101 at 21:50-21:52) He then pursues Batista up the street. (GX 101 at 21:52-21:59; GX 102 at 21:54-21:59) Francis is momentarily distracted when his Chicago White Sox baseball cap falls off his head; Francis turns away from Batista to recover his cap. (GX 101 at 21:52-21:59; GX 102 at

---

[8] (See also May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 34 (Callinan testifying that hospital records show that Batista "suffered a gunshot wound to his left butt cheek that came out the front side of his leg through his scrotum, and the bullet [then] lodged in his right leg"))

[9] Callinan testified that sidewalk segments in New York City are "roughly 3 feet" square. (May 12, 2026 Hearing Tr. (Dkt. No. 73) at 89), but the Rules of the City of New York provide that "[sidewalk] [f]lags shall be 5'x5' where feasible." 34 R.C.N.Y. § 2-09(4)(iv). Moreover, the New York City Zoning & Land Use Map for this area shows that the distance from the deli to the street is 25 feet, which indicates that the sidewalk flags on Alexander Avenue are 5 feet squares. See Zoning & Land Use Application (ZOLA), N.Y.C. Dep't of City Planning, https://zola.planning.nyc.gov/ (last accessed May 15, 2026).

21:54-21:59) While Francis retrieves his baseball cap, Batista pauses at a parked gray SUV, and turns back in Francis's direction. (GX 102 at 21:51-21:58)

After Francis retrieves his baseball cap, he runs in Batista's direction for a couple of seconds, firing a second shot in Batista's general direction. (GX 102 at 22:00-22:03)[10] Batista sprints northbound away from Francis, turning west on 134th Street. (GX 102 at 22:00-22:03) He was not struck by Francis's second shot. (Id.; May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 34)

After firing the second shot, Francis turns and sprints southbound on Alexander Avenue towards Bruckner Boulevard. He then passes out of view of the surveillance cameras. (GX 101 at 22:00-22:15; GX 102 at 22:05-22:28)

### 3. The "Top Taliban" Music Video

During the Fatico hearing, the Government introduced a music video for a song called "Top Taliban." (GX 201) Francis is shown performing the song, rapping under the name "Dev Dillinger." (Id. at 0:06-0:16 (showing "Dillinger" tattoo on Francis's arm)) Francis is dressed all in black and appears to be wearing the same Chicago White Sox baseball cap with the 2005 World Series insignia. As at the deli, Francis wears the cap with the brim tilted far to the left. (Id.)

As discussed below, Francis testified that he wrote the lyrics for the rap video in May or June 2024 (May 13, 2026 Hearing Tr. (Francis Testimony (Dkt. No. 75) at 7), and that the "Top Taliban" music video was filmed on September 17, 2024 – the day before the shooting. (Id.)

---

[10] (See also May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 36 (noting that police found two cartridge casings on Alexander Avenue, one of which was recovered "from the street"))

The "Top Taliban" song that Francis performs contains the following lines: "When we catch an opp; we gonna send him to heaven." (GX 201 at 0:06-0:16 (showing Francis gesturing towards the sky as he raps these words)) Callinan testified that he understands Francis to be saying that he "would like to kill" any rival gang members or "opps" that he encounters.[11] (May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 49-50)

During the song, Francis also raps: "I'm a one blood; when I catch me an opp, he gon' lay in a pool of it." (GX 201 at 1:02-1:08) When Francis raps the lyrics "I'm a one blood" (GX 201 at 1:02-1:08), he makes a "B" symbol with his right hand. (Id. at 1:04) Callinan testified that the "B" symbol is "a Bloods hand sign."[12] (May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 52; see also id. at 50-51 (explaining that the 6-3 Taliban is "made up of Mac Ballers or Bloodhound Brims, both Blood sets"))

Francis's rap also includes a reference to the OGs: "Ayo, OGs K." (GX 201 at 1:19-1:24) Francis testified that the OGs are "people [he is] not cool with" who live "down the block" from him. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 67)

### 4. **Francis's October 2024 Recorded Jail Call**

The Government also introduced excerpts of a call between Francis and his mother that occurred "shortly after his initial arrest in October of 2024." (May 12, 2026 Hearing Tr. (Dkt. No. 73) at 60-61 (citing GX 401)) During the call, Francis tells his mother that he "was

---

[11] As discussed above, Francis testified that "opp" refers to "people I don't see eye to eye with" or "[p]eople that I'm not cool with." (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 63)

[12] Francis testified that his lyrics were not intended to reflect something he had done or planned to do. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 68) He also denied that he "actually did mean that, if [he] encountered an op[p], [he] would shoot them." (Id.)

wrong for holding the gun." (GX 401 at 4:28-4:34) But he denies being "a gang banger," saying that he "left that [stuff] alone . . . after doing six years" in prison. (Id. at 4:34-4:38)

Francis also tells his mother that while he did not recognize Batista and Romin, they recognized him as a member of the 6-3 Taliban:

> This is the thing, ma. I didn't know none of those niggas, like they knew who I was. I didn't know them, you feel me? I swear to God that's true 'cus when they first came to the store, niggas was looking in my face. I wasn't really paying attention to them. I looked at them, but I looked away. You heard? Like, I don't know these niggas, you heard? Like, I wasn't worried about them.
>
> The way I see it, but I'm like, the whole time – I swear to God – the guy from the store, he like "do you know those kids out there?" I like, "nah." He like, "be careful, 'cus I think they out there waiting for you," you heard? The whole time I'm in my head, like please let these niggas have mistaken identity 'cus I ain't trying to get into nothing right now. I'm on my phone. You feel me?
>
> And I walked out that store, and they asked me: "Are you Dev? Just came home from six third?" And I'm like, "yeah bro, what's up?" Nigga, they tried to press up on me, and I don't know, I thought that nigga had a gun, you feel me? So I did what I did.

(Id. at 4:46-5:38) Francis repeats that he "wasn't looking for no trouble" and was just planning on "going to the store for my pregnant girlfriend." (Id. at 5:38-5:52)

### B. The Defense Case

#### 1. Sierra's Testimony

Sierra testified that – as of September 2024 – he had worked behind the counter at the Good Times Deli for more than five years. (May 12, 2026 Hearing Tr. (Sierra Testimony) (Dkt. No. 73) at 114) Sierra left the deli in 2024 and no longer lives or works in the neighborhood. (Id. at 113-14)

Sierra testified that Francis appeared "normal" when he walked into the deli on the afternoon of the shooting. (Id. at 115-16)

After Batista and Romin walked into the deli, Sierra noticed that they "grilled" Francis – stared at him in a hostile manner – and exhibited aggressive "body language." (Id. at 115-16, 119, 123, 128; see also May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 63 (testifying that "grilling" means "staring" at a person with "a threatening demeanor"))

Sierra also noticed that Batista and Romin appeared to be "preplanning something" after they walked outside of the deli. (May 12, 2026 Hearing Tr. (Sierra Testimony) (Dkt. No. 73) at 120) They looked "ready to gang up on [Francis] as soon as he came out of the store." (Id. at 120-22) Based on his long experience working at the Good Times Deli, Sierra was "sure something bad was going to happen." While testifying, Sierra expressed regret that he had not called the police before the shooting. (Id. at 124)

When Francis paid for his sandwich, Sierra asked Francis if he knew the two men waiting outside. Francis said no. (Id. at 122-24, 130-34) Sierra then "told [Francis] to be very careful" and to "watch himself," because Batista and Romin were not acting "normal." (Id.) Francis did not indicate to Sierra in any fashion that he was planning to "pull a gun" on the two men. (Id. at 125)

**2. Francis's Testimony**

Francis testified that he is a member of the "6[-]3 Taliban," but he denied that the 6-3 Taliban is a criminal gang. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 63) According to Francis, the 6-3 Taliban is the name of a "rap group" that he and others "made up." (Id. at 79, 86, 100) Francis confirmed that the "6-3" refers to 163rd Street, where he and other members of the group had grown up. (Id. at 64, 79, 100) The term "Taliban" in the group's name "has to do with rap." (Id. at 80, 86, 100)

Francis testified that he wrote the lyrics to the "Top Taliban" song in May or June of 2024, and that the lyrics are "just an expression of art." (Id. at 7-8) He did not intend for the lyrics in the song to reflect "the truth about things that [he] did or [was] going to do." (Id.)

In June or July 2024, Francis was in the Soundview section of the Bronx, going to the supermarket for his mother. (Id. at 50) "[S]ix or seven young kids" approached and "ran down" on him. (Id.) Francis was unarmed at the time. (Id. at 52) The "kids" asked Francis where he was from. (Id. at 50) Francis replied that he was "not from around [Soundview]" and did not know any of them. (Id.) While "the kids" ultimately "left [him] alone," Francis commented that the incident could have ended differently if he had been approached by "people that [he] had prior problems with" or if he had been mistaken for someone else. (Id.)

In September 2024, Francis was dating Destiny Mateo, who was two months' pregnant with their child. (Id. at 6) On the evening of September 17, 2024 – after the filming of the "Top Taliban" music video (id. at 7) – Francis took a cab to Mateo's apartment on Willis Avenue in the Bronx.[13] (Id. at 9) During the trip, Francis found a handgun on the floor of the cab by his feet. (Id. at 9, 55-56, 62, 83) Francis took the gun with him when he got out of the cab (id.), and he confirmed later that night that the gun was loaded.[14] (Id. at 85) He then slept overnight at Mateo's apartment. (Id. at 9)

The next morning, Mateo asked him to buy her a sandwich. (Id. at 9-10) Francis walked to a deli located about "five minutes" away from Mateo's apartment. (Id. at 10; see also

---

[13] Mateo's apartment is located some miles away from the neighborhood in which the 6-3 Taliban, the Courtlandt OGs and the 280 Crips operate. (See May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 63-66 (explaining that the Good Times Deli is located "at least 20 blocks" away from the area associated with the 280 Crips, and is similarly distant from the areas associated with the 6-3 Taliban and the Courtlandt OGs))

[14] Francis denied knowing whether the gun was operable, and stated that – prior to September 18, 2024 – he had never fired a gun. (Id. at 9, 54)

GX 101 at 16:45-17:20 (showing Francis walking to the deli)) He took the gun with him. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 48)

The Court questioned Francis about why he took the gun with him for the short trip to the deli:

> THE COURT: So you're not expecting to encounter anyone who knows you, right?
>
> THE DEFENDANT: Yes.
>
> THE COURT: But you b[r]ought a gun with you?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And so why did you feel it was necessary to bring a gun with you to make the five-minute trip to get the sandwich for your girlfriend? Why was it necessary to bring a gun with you?
>
> THE DEFENDANT: Because to be honest, your Honor, no disrespect and respectfully, I'm from the Bronx, your Honor. I got friends that went to the store and never came back. And I got people that I know, people that I don't know you see on the news a lot of people is out there dying.
>
> THE COURT: So are you saying that –
>
> THE DEFENDANT: – anything can happen.
>
> THE COURT: So are you telling us then that whenever you're out on the street in the Bronx, you bring a gun with you? Is that what you're saying?
>
> THE DEFENDANT: No.

(Id. at 48-51)

Francis went on to testify that that there was "no particular reason" that he brought a gun with him that day. (Id. at 51 (stating that it that it was "just random" that he brought the gun with him); cf. id. at 62 (testifying that he brought a gun with him because he "was going to the store" and the Bronx is a "treacherous" place where "[y]ou got to be on your

Ps and Qs")) He did not expect to encounter anyone he knew, and he did not expect to get into a fight with or shoot anyone. (Id. at 14, 47, 49)

Francis testified that he did not recognize Batista or Romin when they walked into the deli, and he does not believe that he had ever seen them before. (Id. at 18-19, 22)

Inside the deli, Francis noticed that Batista and Romin were "grilling" him – "staring" at him with "a threatening demeanor." (Id. at 70-71; see also id. at 19 (stating that Batista and Romin were "looking directly at [him]")) Francis "sensed a problem" at this point, "solely from the way that [Batista and Romin] looked at [him]." (Id. at 69-70; see also id. at 22 (testifying that he became "nervous")) Francis also noticed that Batista's left hand was stuck inside the waistband of his sweatpants (id. at 20, 25), which led Francis to believe that Batista was carrying a gun. (Id. at 20) Francis believed that he was in danger. (Id. at 68)

After Sierra told Francis to be "very careful" and to "watch himself" (May 12, 2026 Hearing Tr. (Sierra Testimony) (Dkt. No. 73) at 122-24, 130-34), Francis walked to the front of the store and looked outside to see whether Batista and Romin were waiting for him. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 28) Francis saw that Batista and Romin were "outside waiting for [him]," and he noticed that Batista was periodically "tucking in his pants." (Id.) At 12:46:19 p.m, Francis observed Romin "walking towards the car" and surmised that he and Batista might be leaving the area. (Id. at 26, 29)

As Francis prepared to leave the store, however, he saw that Batista and Romin were approaching the entrance of the deli. (Id. at 77) Francis believed that Batista and Romin were going to "do something to [him]" when he left the deli. (Id. at 72-73; see also id. at 30 (testifying that he observed the men walking towards him "like they w[ere] going to do something")) Francis had not formed a plan to shoot at Batista and Romin, however. (See, e.g.,

id. at 68-69 ("Q. So when you walked out of the deli, you were prepared to fire a gun; is that right? A. No, I wasn't prepared to fire my gun."); id. at 72 (When asked whether his right hand was in his hoodie pocket because he was "prepared to shoot in case something happened," testifying, "No, not really, but if I had to."))

When Francis walked out of the deli, he hoped to avoid any confrontation with Batista and Romin. He deliberately looked away from them when leaving the store, because he believed that "just making eye contact" with them could lead to violence. (Id. at 78; see also id. at 30, 33 (testifying that he attempted to ignore Batista and Romin when exiting the store, and that he looked away because he "was trying to avoid trouble")) Francis testified that he did not see Romin make the inverted gang sign because he was looking and facing rightward.[15] (Id. at 33)

Batista spoke to Francis as he stepped out of the deli, asking whether he was "Dev." Francis answered yes. (Id. at 30) Batista then asked Francis if he was "from [six third]" and had just "came home."[16] (Id.; see also id. at 79 ("Q. And he asked you if you were 63rd; is that right? A. Yes."); GX 401 (Francis Recorded Jail Call) at 5:26-5:29 (Francis stating that Batista and Romin asked if he "[j]ust came home from six third")) Francis answered yes and told them, "I don't know you," and warned them to "Step off." (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 31, 34)

Batista ignored Francis's warning to "step off" and continued to walk towards Francis. (GX 101 at 21:40-21:50) Francis concluded that Batista was "about to do something"

---

15 The surveillance camera footage supports Francis's account that he was looking away from Batista and Romin when he walked out of the deli. (See GX 101 at 21:35-21:45)

16 The Court understands "came home" to be a reference to the fact that Francis had recently been released from prison.

to him. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 35-36) Although Batista was holding a phone in his left hand, Francis testified that he was nonetheless concerned that Batista might reach into his waistband to retrieve a weapon. (Id. at 35-37; see also id. (stating that he believed Batista was "going for whatever he got")) Francis was "scared" and "nervous" in that moment. (Id. at 34)

When Francis pulled a gun out of his hoodie pocket, he observed that Batista began to run away. (Id. at 38) Francis testified that he did not intend to kill Batista when he fired the first shot. (Id. at 42-43, 45) He merely intended "to get [Batista and Romin] off [him]." (Id. at 42; see also id. ("When I first shot the gun, everything happening so fast, your Honor, . . . I was scared, . . . like your mind is not really there."); id. ("The only thing that was going through my mind was making it back to my family."); id. at 43 (Francis testifying that when he shot Batista he was just thinking about his "safety and what they're gonna do to me."))

While Francis denied that he had formed any intent to kill Batista, he admitted that – in firing the first shot – he intended to hit and disable Batista. (See id. at 46 (stating that he aimed at Batista's leg); id. at 93 (testifying that he intended to shoot Batista in the legs)) Francis avoided "shoot[ing] upward or anything like towards [Batista's] head," however, because he believed that doing so would "hurt [Batista] badly." (Id. at 41)

When asked why he pursued Batista after firing the first shot, Francis stated that his "mind [was] not really there" because "everything [was] moving so fast." (Id. at 40) He was not thinking clearly at the time. (Id. at 47) But Francis also testified that he believed that he might still be in danger: "[I]t look[ed] like [Batista] came back" and was "about to run" in his direction. (Id. at 46)

As to the second shot, Francis stated that he "didn't aim at [Batista]." (Id. at 45)) He "shot high up in the air,"[17] with no intent to kill Batista. (Id.) In firing the second shot, Francis intended to dissuade Batista and Romin from following him back to Mateo's apartment. He did not "want them to see which way [he was] going to run." (Id. at 44; see also id. at 44-45 ("[T]his is where my family lay their head at. I didn't want them to chase me back to her building now they know, like, I be around here . . . ."))

In sum, Francis did not intend to kill either Batista or Romin at any point during their interaction. (Id. at 52-53) He "wasn't looking for [any] trouble" that day, and was simply "at the wrong place at the wrong time." (Id.)

### 3. Anonymous Witness Report

Defense counsel also introduced a September 19, 2024 police report containing a statement from an anonymous witness. (May 12, 2026 Hearing Tr. (Dkt. No. 73) at 103 (citing DX A)) The witness states that she was walking out of the deli when she observed two men approach "a male dressed in all black." (DX A) "[T]he male in all black stated, 'step off' when the other 2 [men] kept moving towards him." (Id.) The man in black then fired three shots at the other two individuals.[18] (Id.)

## III. POST-HEARING SUBMISSIONS

After the Fatico hearing, this Court issued an order directing the parties to submit post-hearing briefing. (Dkt. No. 67) The Government submitted its brief on May 27, 2026

---

[17] As discussed below, the surveillance camera footage (GX 102 at 22:00-22:03), tends to support Francis's account that he fired only in Batista's general direction.

[18] Two shell casings were found at the scene, and it is undisputed that Francis fired only two shots. (See May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 36 (testifying that police recovered two cartridge casings on Alexander Avenue))

(Govt. Br. (Dkt. No. 68)), and Francis filed his opposition on June 26, 2026. (Def. Opp. (Dkt. No. 69)) The Government submitted a reply on July 6, 2026. (Govt. Reply (Dkt. No. 70))

The Government contends that the evidence introduced at the Fatico hearing demonstrates that Francis committed either attempted murder in the first degree or attempted murder in the second degree. (Govt. Br. (Dkt. No. 68) at 14-28) Francis contends that the evidence is sufficient to demonstrate only aggravated assault. (Def. Opp. (Dkt. No. 69) at 4-12)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Resolution of Factual Issues at Sentencing

At sentencing, the Government has the burden of proof as to any disputed factual issues, subject to the preponderance of the evidence standard. United States v. Ruggiero, 100 F.3d 284, 290 (2d Cir. 1996) In sentencing a defendant, a district court may, of course, consider conduct to which a defendant did not plead guilty, as long as doing so "does not increase either the statutory minimum or maximum available punishment." United States v. Ulbricht, 858 F.3d 71, 128 (2d Cir. 2017) (citing United States v. Stevenson, 834 F.3d 80, 85 (2d Cir. 2016); United States v. Ryan, 806 F.3d 691, 693-94 (2d Cir. 2015)).

### B. Cross-References Under U.S.S.G. §§ 2K2.1 and 2X1.1

U.S.S.G. § 2K2.1 governs the unlawful possession of firearms and ammunition, including violations of 18 U.S.C. § 922(g). United States v. Jackson, 351 F. Supp. 2d 108, 112 (S.D.N.Y. 2004). Section 2K2.1(c) reads as follows:

> If the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense, . . . apply –
>
> (A) § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined [under 2K2.1(a)-(b)]. . . .

Section 2X1.1 provides that "'[w]hen an attempt . . . is expressly covered by another offense guideline section, apply that guideline section.'" United States v. Scott, No. 22-2705-cr, 2025 WL 3537339, at *2 (2d Cir. Dec. 10, 2025) (alterations in original) (quoting U.S.S.G. § 2X1.1(c)(1)). "Section 2A2.1 expressly covers attempted murder and provides for a base offense level of 33 'if the object of the offense would have constituted first degree murder' and a base offense level of 27 otherwise." Id. at *2 (citing U.S.S.G. § 2A2.1(a)).

## II. WHETHER FRANCIS COMMITTED ATTEMPTED MURDER

The Government argues that the evidence introduced at the Fatico hearing demonstrates that Francis committed attempted murder in the first degree, and that accordingly "the appropriate cross-reference under § 2K2.1(c)(1)(A) is attempted murder in the first degree under § 2A2.1(a)(1)." (Govt. Br. (Dkt. No. 68) at 28)

### A. Applicable Law

U.S.S.G. § 2A2.1 "incorporates the definition of murder contained in 18 U.S.C. § 1111." Scott, 2025 WL 3537339, at *2 (citing U.S.S.G. § 2A2.1(a) cmt. n.1). Section 1111(a) defines murder as "the unlawful killing of a human being with malice aforethought." See 18 U.S.C. 1111(a).

"The 'malice aforethought' element . . . may be satisfied with 'intent-to-kill without premeditation and deliberation.'" United States v. Guererro, 52 F. Supp. 3d 643, 652 (S.D.N.Y. 2014) (quoting United States v. Regnier, 44 F. App'x 524, 528 (2d Cir. 2002) (quoting United States v. Pearson, 159 F. 3d 480, 486 (10th Cir. 1998))). "Malice is not satisfied simply by killing with an intentional or reckless mental state; instead, malice specifically requires committing the wrongful act without justification, excuse, or mitigation." United States v. Whiteside, 207 F. Supp. 3d 311, 321 (S.D.N.Y. 2016) (citation and quotation marks omitted).

"[F]irst degree murder requires a 'willful, deliberate, malicious, and premeditated killing.'" Id. at 320 (quoting 18 U.S.C. 1111(a)). "Any other murder is second degree." Id.; see also United States v. Delaney, 717 F.3d 553, 556 (7th Cir. 2013) ("The only difference between the two degrees of murder, sharing as they do the requirement that the murder have acted with 'malice aforethought,' is . . . that a first-degree murder . . . must be 'premeditated.'").

"'Premeditation means with planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances[;] [i]t must be long enough, after forming the intent to kill, for the killer to have been fully conscious of the intent and to have considered the killing.'" Whiteside, 207 F. Supp. 3d at 320 (first quoting United States v. Begay, 673 F.3d 1038, 1042-43 (9th Cir. 2011); then citing United States v. Mulder, 273 F.3d 91, 117 (2d Cir. 2001)). "'Premeditation [also] requires a "cool mind" that is capable of reflection and some appreciable time for reflection and consideration before execution of the act.'" United States v. Belmar, No. 21-CR-16 (KMW), 2024 WL 2798860, at *3 (S.D.N.Y. May 31, 2024) (quoting United States v. Cespedes, No. 11 Cr. 1032 (PAE), 2015 WL 4597539, at *3 (S.D.N.Y. July 30, 2015)).

Moreover, attempted murder under Section 2A.1 requires "'conduct amounting to a "substantial step" towards the commission of the crime.'" United States v. Passley, Nos. 22-1361(L), 22-1368 (Con.), 2023 WL 8921150, at *1 (2d Cir. Dec. 27, 2023) (quoting United States v. Martinez, 772 F.2d 31, 35 (2d Cir. 1985)).

Attempted murder under U.S.S.G. § 2A.1 also "'require[s] specific intent to kill.'" United States v. Gavalo, No. 25-783-CR, 2026 WL 1800683, at *1 n.2 (2d Cir. June 23, 2026) (quoting United States v. Mumuni, 946 F.3d 97, 108 (2d Cir. 2019)). Accordingly, the cross-reference for attempted murder applies only where the Government has "established by a

preponderance of the evidence that the defendant had a specific intent to kill." Belmar, 2024 WL 2798870, at *3 (citing Braxton v. United States, 500 U.S. 344, 351 n.* (1991); United States v. Kwong, 14 F.3d 189, 194 (2d Cir. 1994)). "By necessity, [such] intent must usually be proven by circumstantial evidence." Kwong, 14 F.3d at 194 (citations omitted).

**B. Analysis**

Here, the parties dispute whether Francis had the "specific intent to kill," which is a necessary state of mind for application of the attempted murder Guidelines provision, U.S.S.G. § 2A1.1. The Government argues that the evidence introduced at the Fatico hearing demonstrates that Francis had the necessary "specific intent to kill" Batista (Govt. Br. (Dkt. No. 68) at 15-28), while Francis contends that the evidence merely demonstrates that he "intentionally discharged a firearm during a rapidly unfolding confrontation." (Def. Opp. (Dkt. No. 69) at 9)

According to the Government, the Court should infer the necessary "specific intent to kill" Batista from (1) Francis's "professed intent in his rap video to kill 'opps'" (Govt. Br. (Dkt. No. 68) at 14-15); and (2) the circumstances of the shooting, including Francis's possession of a gun, Batista's reference to Francis's gang affiliation, Francis's first shot wounding Batista, and his pursuit of Batista and his firing of the second shot. (Id. at 15-24)

**1. Whether the "Top Taliban" Rap Video Demonstrates that Francis Had a "Specific Intent to Kill" Batista**

According to the Government, in the "Top Taliban" rap video, Francis references his membership in the 6-3 Taliban and expresses a desire to kill any gang rivals that he may encounter. (Id. at 8-10, 14-15)

Francis counters that, "[a]t most, the video constitutes generalized evidence of Francis's alleged gang affiliation and participation in a musical performance containing violent themes." (Def. Opp. (Dkt. No. 69) at 7-8)

As an initial matter, the Court concludes that the record in this case demonstrates that Francis is a member of the 6-3 Taliban, which is a Bloods-related gang.

As discussed above, Francis pled guilty to racketeering conspiracy in September 2022, arising out of his involvement in the Mac Ballers Bloods gang between 2015 and March 2020. (Indictment (Dkt. No. 1) ¶¶ 1-12, 23-30, United States v. Lewis et al., 20 Cr. 234 (LAP) (S.D.N.Y. Mar. 26, 2020); September 14, 2022 Minute Entry, United States v. Lewis et al., No. 20 Cr. 234 (LAP) (S.D.N.Y. Sept. 14, 2022). He was sentenced to four years' imprisonment in that case, and began his term of supervised release in April 2024, just five months before the shooting at issue. (Judgment (Dkt. No. 144) at 2-3, United States v. Lewis et al., No. 20 Cr. 234 (LAP) (S.D.N.Y. May 24, 2023); May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 3-5)

According to Detective Callinan, the 6-3 Taliban is "made up of Mac Ballers and Blood Hound Brims, both Bloods sets." (May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 51) And while Francis testified that the 6-3 Taliban is nothing more than a rap group, the evidence is to the contrary. Detective Callinan testified at length about the 6-3 Taliban's illegal and violent activities, based on interviews he has conducted with gang members, recorded prison calls, search warrant returns, and other sources. (Id. at 13, 19-23, 106-07) Detective Callinan also offered testimony concerning the 6-3 Taliban's rival gangs, including the Courtland OGs. (Id. at 20-21, 53-54, 63) Francis's references to the "OGs" in his rap video, his use of gang signs in the rap video (see May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No.

73) at 51 ("That is a Bloods hand sign. It makes a – I can't do it with my hands, but it makes a B out of your fingers, like it presses over and makes a B."); GX 201 at 1:04 (showing Francis displaying this hand sign)), his expressions of antipathy for the Courtlandt OGs [and the 280 Crips] – and his expressed desire to send "opps" like them to heaven – when considered with his documented history of membership in a closely related Bloods gang – all tend to confirm Detective Callinan's assertions that Francis is a member of the 6-3 Taliban, a violent Bloods-related gang.

The "Top Taliban" rap video is of limited probative value in demonstrating that Francis had a "specific intent to kill" Batista, however. While Francis promises to send his "opps" to heaven in his rap video, assuming arguendo that such statements in a rap video could be viewed as shedding light on a defendant's state of mind at a later point in time (see, e.g., United States v. Pierce, 785 F.3d 832, 841 (2d Cir. 2015) (affirming the admission of a rap video where "[t]he government proffered the rap video to show [the defendant]'s animosity towards [a rival gang], as well as his association with [his own gang]"); United States v. Jordan, 714 F. Supp. 3d 158, 163-66 (E.D.N.Y. 2024) (stating that rap lyrics are properly admitted where there is a "specific factual nexus between the content of the rap music and the crimes alleged" (citations omitted)), here the record does not indicate that Francis understood Batista and Romin to be members of a rival gang.

Indeed – while staying with his girlfriend on Willis Avenue – Francis was far outside the territory of the 6-3 Taliban and its rival gangs, whether the Courtlandt OGs or the 280 Crips. (See May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 63-66) Moreover, Francis testified that he did not recognize Batista and Romin and had never seen them before. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 18-19, 22) There is no contrary

evidence. And while the Government contends that Batista flashed an inverted 6-3 Taliban gang sign at Francis when Francis was walking out of the Good Times Deli – a sign of disrespect towards that gang (May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 52) – Francis denies seeing that gang signal, and the surveillance camera footage tends to support Francis's claim that he was looking away from Batista at that time, hoping to avoid a violent encounter. (See May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 33; GX 101 at 21:35-21:45)

In sum, the evidence shows that Francis shot Batista not because he believed him to be a member of a rival gang, but because he felt threatened by Batista and Romin. Indeed, the threatening demeanor of Batista and Romin was obvious not only to Francis, but to Sierra as well, who – because of his many years operating a business at that location – could sense when violence was about to occur. Given these circumstances, Francis's reference to killing "opps" in his rap video does not demonstrate that he had a "specific intent to kill" Batista.

**2. Whether the Circumstances of the Shooting Demonstrate that Francis had a "Specific Intent to Kill" Batista**

The Government argues that the following circumstances of the shooting demonstrate that Francis intended to kill Batista:

(1) Francis walked out of his girlfriend's apartment "with a loaded gun" (Govt. Br. (Dkt. No. 68) at 24);

(2) Francis "had several minutes [after he first encountered Batista and Romin] to keep an eye on them and think through his next moves" (id. at 25);

(3) Francis "had enough time to keep his hands free and grip his firearm" while inside the store (id.);

(4) Francis became "aware[] that Romin and Batista had identified his gang affiliation" (id. at 15);

(5) Francis fired the first shot "at very close range" (id. at 25);

(6) Francis "ran after the fleeing victim" (id.); and

(7) Francis "fired a second shot." (Id.)

Francis argues that the surveillance footage and his testimony demonstrate that he did not have a specific intent to kill Batista. (Def. Opp. (Dkt. No. 69) at 8-9)

**a. Possession of a Firearm and Initial Encounter with Batista and Romin**

Francis's possession of a firearm on the day of the shooting is not – standing alone – evidence of a specific intent to kill Batista. As discussed above, given that Francis was far outside the territory of his own gang and that of rival gangs, he had no reason to expect trouble during his five-minute walk to the deli. Indeed, there is no evidence that Francis expected to engage in a shooting that day, or that he sought out conflict.

Although it was apparent to both Francis and Sierra that Batista and Romin appeared hostile towards Francis – and were waiting outside the deli in order to confront him when he left (May 12, 2026 Hearing Tr. (Sierra Testimony) (Dkt. No. 73) at 120; May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 26); see also GX 103 at 18:36-19:00, 18:46-19:06; GX 107 at 0:37-0:50, 1:20-1:38 (showing Romin and Batista staring menacingly at Francis inside the deli)) – the evidence indicates that Francis had not formed a plan to attack them when he left the store. Indeed, it is apparent from the surveillance footage and Francis's testimony that he looked away from Batista and Romin when he left the deli, and sought to avoid further contact with them. (GX 101 at 21:35-21:45)

The Court concludes that Francis was carrying a gun that day in order to defend himself in the event that that became necessary.[19] (See May 13, 2026 Hearing Tr. (Francis

---

[19] Francis testified about another incident outside his neighborhood in which he felt threatened. While visiting his mother in the Soundview section of the Bronx, he had been approached by a number of juveniles in a threatening manner. Francis was not armed at that time, and remarked

Testimony) **at 72** (Francis admitting that he was prepared to fire his weapon "if [he] had to")) But he did not leave his girlfriend's apartment with any specific plan to use the firearm that day. And when he unexpectedly encountered the hostile Romin and Batista inside the deli, he formed a plan to avoid a violent encounter with them once he left the deli. The evidence does not show that Francis had formed a plan to shoot them when he walked out of the deli.

**b. <u>Events Outside the Deli and the Firing of the Two Shots</u>**

The surveillance footage and the testimony of Sierra and Francis show that Batista and Romin waited outside the deli for Francis to leave, seeking to confirm that he was a member of the 6-3 Taliban who had recently been released from prison. They appeared ready to attack Francis once he provided that confirmation. (GX 101 at 19:15-21:48; GX 102 at 19:15-21:48; May 12, 2026 Hearing Tr. (Sierra Testimony) (Dkt. No. 73) at 120-24; May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 26, 28-31, 34, 72-73; GX 401 (Francis Recorded Jail Call) at 5:01-5:29) Given their behavior inside and then outside the deli, it was reasonable for Francis to conclude that they presented a risk of harm to him.[20] He nonetheless sought to avoid a violent confrontation with them.

When Francis left the deli with the sandwich for his girlfriend, he deliberately did not look at Romin and Batista, in an effort to avoid a confrontation. (GX 101 at 21:35-21:45; May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 30, 33, 78) As they approached from Francis's left, Francis walked to his right up the block, with his face turned away. (GX 101

---

that while he escaped unscathed on that occasion, the result could have been different. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 50)

[20] The surveillance footage also confirms Francis's testimony that Batista's left hand was placed inside of his waistband during much of Batista's time inside and outside the deli, which indicated to Francis that he was armed. (GX 101 at 19:15-21:20; GX 102 at 19:15-21:20; GX 103 at 18:36-19:00; May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 20, 25)

at 21:35-48; GX 102 at 21:39-50; GX 107 at 3:53-4:00) And while Detective Callinan testified that Romin flashed an inverted 6-3 Taliban gang sign in Francis's direction as Francis walked out of the deli – which is a sign of disrespect (May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 52) – the surveillance footage corroborates Francis's testimony that he did not see Romin flashing this sign, because he was looking away from Batista and Romin. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 33; GX 101 at 21:35-21:45)

In arguing that Francis had a specific intent to kill Batista, the Government asserts that Francis became "aware that Romin and Batista had identified his gang affiliation." (Govt. Br. (Dkt. No. 68) at 15).

As Francis left the deli he was approached by Batista, who asked Francis whether he was "Dev," whether he was from "six third," and whether he had just "came home." (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 73) at 30, 79; GX 401 (Francis Recorded Jail Call) at 5:26-5:29)) It would have been reasonable for Francis to infer from Batista's questioning that Batista and Romin were aware that he was a member of the 6-3 Taliban who had recently been released from prison. But Francis's awareness that Batista and Romin had "identified his gang affiliation" does not demonstrate that Francis then formed a specific intent to kill Batista.

As an initial matter, while Francis was aware of Batista and Romin's (1) hostility towards him, and (2) knowledge that he was a member of the 6-3 Taliban, Francis was not aware of any gang affiliation that they might have. Moreover, after Batista's questioning, Francis did not pull out his weapon. He instead continued walking away from Batista and Romin; said "I don't know you"; and warned them to "step off." (May 13, 2026 Hearing Tr. (Francis

Testimony) (Dkt. No. 73) at 31, 34) Francis was thus still attempting to avoid a violent encounter with Batista and Romin, even after they referenced his gang affiliation.

Batista and Romin ignored Francis's warning, however, and continued to approach Francis. (GX 101 at 21:40-21:50) Francis concluded that Batista and Romin were about to attack him. It was in this context that Francis took the gun out of his hoodie pocket. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 34-38) After Francis pulled out his gun, he observed Batista turn to run away. (Id. at 38; GX 101 at 21:50-21:52) Francis nonetheless fires a shot at Batista, who is struck in his left buttock. (GX 101 at 21:50-21:54; May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 34) Batista was standing about 12.5 feet away from Francis when Francis – who is still backpedaling from Batista and Romin – fires his first shot. (GX 101 at 21:49-21:52)

The Government argues that Francis's decision to fire his first shot at Batista while "at very close range" demonstrates that Francis had formed a specific intent to kill Batista. (Govt. Br. (Dkt. No. 68) at 25) But Francis denies that he intended to kill Batista (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 42-43, 45), and the circumstances of the first shot favor his account.

"[I]ntent to kill can[, of course,] be inferred where the defendant shoots . . . at close range." McCallum v. United States, No. 14 Cr. 476 (CS), 2019 WL 5088587, at *7 (S.D.N.Y. Mar. 1, 2019) (citations omitted), abrogated on other grounds by United States v. Davis, 588 U.S. 445 (2019). But the fact that a shooting took place at close range is not dispositive as to the intent to kill issue. See, e.g., Order (Dkt. No. 60) at 2, United States v. Tartt, No. 20 Cr. 339 (LGS) (S.D.N.Y. Jan. 10, 2022)) (finding that a close range shooting amounted to aggravated assault under the Sentencing Guidelines where surveillance footage suggested that

the defendant merely "intended to injure" one of his victims); see also Hall v. Phillips, No. 05 Civ. 01981, 2010 WL 6612518, at *7 (S.D.N.Y. Apr. 14, 2010) ("That the shot was fired at close range does not prove intent to kill. . . . [T]he shooting could have been instantaneous, or impulsive, perhaps to disable or frighten [the victim] rather than to kill him." (citations and quotation marks omitted)).

Here, the circumstances of the first shot suggest that while Francis intended to hit Batista, to disable him, and to ward off what Francis believed would be an imminent attack, he did not form an intent to kill him. Francis does not shoot Batista in his vital organs or in his head. He instead aims for Batista's legs. The evidence thus tends to corroborate Francis's account that while he intentionally aimed to hit Batista's legs and to disable him, he did not intend to kill him when he fired his first shot. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 41-43, 45-46, 93)

The Government further argues, however, that Francis's specific intent to kill Batista can be inferred from the fact that he "ran after the fleeing victim" and then "fired a second shot." (Govt. Br. (Dkt. No. 68) at 25) In this regard, the Government asserts that "nothing obstructed Francis from running back to safety at his girlfriend's apartment" after he fired the first shot, but he nonetheless pursued Batista. (Govt. Br. (Dkt. No. 68) at 21 (citations omitted))

The video evidence shows that – after being hit by the first shot – Batista runs northbound on Alexander Avenue. (GX 101 at 21:50-21:54; GX 102 at 21:51-22:00) Francis initially pursues Batista but is momentarily distracted when his Chicago White Sox baseball cap falls off his head. Francis stops to retrieve his baseball cap while Batista runs away. (Id. at

21:52-21:59; GX 102 at 21:54-21:59) While Francis retrieves his baseball cap, Batista pauses at a parked gray SUV, and turns back in Francis's direction. (GX 102 at 21:51-21:58)

The surveillance footage demonstrates that Francis fired his second shot after he observes Batista – who is jumping up and down – at the parked gray SUV. Batista had stopped his flight and remained in the area while Francis retrieved his baseball cap. (GX 102 at 21:55-21:58) Francis testified that because Batista had remained in the area, he believed that he might still be in danger: "[I]t looked like [Batista] came back" and was "about to run" in his direction. (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 46-47)

While the Government asserts that Francis then "aimed [his gun] at Batista" and fired a second shot (Govt. Br. (Dkt. No. 68) at 14), that overstates what the video evidence shows. At best, Francis – who was a significant distance from Batista – fires a second shot in Batista's general direction. (GX 102 at 22:00-22:03) The second shot does not hit Batista. (See May 12, 2026 Hearing Tr. (Callinan Testimony) (Dkt. No. 73) at 34 (testifying that Batista's hospital records show only one gunshot wound))

Francis, for his part, testified that – in firing the second shot – he "didn't aim at [Batista]," and instead "shot high up in the air." (May 13, 2026 Hearing Tr. (Francis Testimony) (Dkt. No. 75) at 45) There is no contrary evidence.

Francis further explained that – in firing the second shot – he intended to dissuade Batista and Romin from following him back to Mateo's apartment. He did not "want them to see which way [he was] going to run." (Id. at 44; see also id. at 44-45 ("[T]his is where my family lay their head at. I didn't want them to chase me back to her building now they know, like, I be around here. . . ."))

In sum, Francis's short pursuit of Batista and his firing of the second shot does not demonstrate that Francis had a specific intent to kill Batista.

## CONCLUSION

The Court concludes that the Government has not established by a preponderance of the evidence that Francis had a specific intent to kill Batista on September 18, 2024. Accordingly, the Court will not apply the Sentencing Guidelines provisions applicable to attempted murder (see U.S.S.G. § 2A2.1) and instead intends to apply – pursuant to U.S.S.G. § 2K2.1(c)(1) – the Sentencing Guidelines provisions applicable to aggravated assault (see U.S.S.G. § 2A2.2).[21]

The U.S. Probation Office is directed to prepare a Presentence Report. Sentencing is scheduled for **February 5, 2027, at 11:00 a.m.**, in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. The Defendant's sentencing submission is due on **January 4, 2027**, and the Government's sentencing submissions is due on **January 11, 2027**.

Dated: New York, New York
October 27, 2026

SO ORDERED.

Paul G. Gardephe
United States District Judge

[21] Subject to hearing the views of the U.S. Probation Office and the parties, the Court believes that the evidence would support a finding that Francis – in committing his Section 922(g) offense – also committed "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury . . . with that weapon; [and] (B) serious physical injury." U.S.S.G. § 2A2.2 cmt. n.1.